**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Milton S. SLOAN, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 14, 2013.

Filed March 12, 2013.

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Assistant District Attorney and Mary L. Huber, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., GANTMAN, J., and LAZARUS, J.

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction on the charges of burglary, criminal trespass, theft by unlawful taking, receiving stolen property, and criminal mischief.[1] Appellant contends (1) the trial court erred in precluding evidence of his out-of-court statements, which he made to his father, and (2) the evidence was insufficient to sustain his convictions. We affirm.

The relevant facts and procedural history are as follows: Following his arrest on burglary and related offenses, on July 7, 2011, Appellant, who was represented by counsel, proceeded to a bench trial at which Harold Walters, Michael Somers, Detective Patrick Whalen, and Appellant's father testified. Specifically, Mr. Walters testified that, on September 6, 2010, he lived in a row house in Philadelphia with four roommates and, at 11:00 a.m., he left the residence. N.T. 7/7/11 at 8–9. When he left, all of the doors, including the back door, were locked. N.T. 7/7/11 at 13. Since it was Labor Day weekend, Mr. Walters' roommates were "out of the City," and no one had permission to be in the row house on September 6, 2010. N.T. 7/7/11 at 10–11.

At 1:40 p.m., Mr. Walters returned to the row house and, upon walking in the front door, he noticed, on the kitchen floor, glass from a now shattered window of the back door. N.T. 7/7/11 at 11. Fearing someone was in the house, Mr. Walters went outside and called 911. N.T. 7/7/11 at 11–12. After a police officer arrived, he and Mr. Walters walked through the house, checking it for suspects. N.T. 7/7/11 at 15. Once the house was "cleared," the officer left, telling Mr. Walters to check for missing property and to contact the police if needed. N.T. 7/7/11 at 15.

Mr. Walters inspected the rooms of the row house and noticed a green piggy bank, which contained one hundred dollars, was missing from his bedroom. N.T. 7/7/11 at 14. Also, upon going into the backyard, Mr. Walters noticed a patio chair had been moved in his absence and placed up against the high back fence. N.T. 7/7/11 at 16–19. When he stood on the chair and looked into his neighbor's backyard, he saw what appeared to be a fresh piece of broken fence. N.T. 7/7/11 at 16. Mr. Walters jumped the fence for a closer inspection and, when he went to jump the fence back into his own yard, he saw a flat screen television, which someone had covered with brush and tucked between his wooden fence and the neighbor's chain-link fence. N.T. 7/7/11 at 16–17. Mr. Walters specifically testified as follows regarding the location of the television:

1. 18 Pa.C.S.A. §§ 3502, 3503, 3921, 3925, and 3304, respectively.

[Mr. Walters]: Behind my fence, I guess you would say, the back of my fence, there was—I could see there was something in there. So I got back into my yard and reached under and pulled out a TV that was from someone—someone else's room. So in my backyard is a six-foot wooden fence that our landlord put up because it's nicer than what the fences are in the back. And right up against another fence in the back, there's a couple inches between the two and then it was all brush grown over. I weed whacked everything down in my yard so you can see the back fence which was covered when I first moved in. And I reached underneath it and I grabbed the TV and pulled it out into my yard.

\* \* \*

[ADA]: What—I guess what I was trying to figure out, and have the Judge understand, is if you are standing not in your yard, but on the other side of the fence, would you had been able to somehow put that TV in the place where you found it?

[Defense Counsel]: Objection. This is leading.

THE COURT: I'll allow it. Go ahead.

[Mr. Walters]: No.

[ADA]: Why not?

[Mr. Walters]: It was out of reach and there was overgrown ivy trees/grass in the way.

N.T. 7/7/11 at 17, 23.

Mr. Walters indicated that, after he pulled the flat screen television out from behind the fence, he could actually see fingerprints on the television and, therefore, he called the police. N.T. 7/7/11 at 25–26. He confirmed the television belonged to one of his roommates. N.T. 7/7/11 at 27.

On cross-examination, Mr. Walters testified a police officer, who responded to his second call, fingerprinted the television. N.T. 7/7/11 at 33. On redirect-examination, Mr. Walters indicated that, after he retrieved the television from outside, no one touched it prior to the police officer lifting fingerprints from it. N.T. 7/7/11 at 37. Mr. Walters testified he did not know Appellant and he never gave him permission to go inside of the row house or to remove the television therefrom. N.T. 7/7/11 at 37.

Michael Ryan Somers testified he was one of Mr. Walters' roommates and, on September 6, 2010, he was not in the Philadelphia area, having left the City on September 4, 2010. When he left the row house, his laptop and 20–inch flat screen television were in his bedroom, and he locked the front and back doors of the row house. N.T. 7/7/11 at 39–41. Although his television was returned to him, his laptop was not. N.T. 7/7/11 at 40–41.

At this point, the parties stipulated Timothy Hicks was also one of Mr. Walters' roommates and, when he left Philadelphia on September 5, 2010, he locked the row house, with his laptop in his bedroom. N.T. 7/7/11 at 44. When he returned after the Labor Day holiday, his laptop was gone and he gave no one permission to take it. N.T. 7/7/11 at 44–45. The laptop was never returned to him. N.T. 7/7/11 at 45. Additionally, the parties stipulated Matthew Tarullo was a roommate of Mr. Walters, and he left the City on September 4, 2010. When he returned after the Labor Day holiday, he discovered his laptop and IPod had been removed from his bedroom, and he did not give anyone permission to take these items. N.T. 7/7/11 at 45. The items were never returned to him. N.T. 7/7/11 at 45.

Detective Patrick Whalen testified he received the call indicating Mr. Walters had recovered the flat screen television from underneath the backyard fence and he lifted four latent fingerprints from the television. N.T. 7/7/11 at 47. On September 20, 2010, he received notice "there was a hit on the fingerprints." N.T. 7/7/11 at 48. Namely, a fingerprint belonged to Appellant. N.T. 7/7/11 at 48. After confirming with Mr. Walters and his roommates that they did not know Appellant and they had not given him permission to be in possession of the television, Detective Whalen submitted an affidavit for an arrest warrant for Appellant. N.T. 7/7/11 at 48. Also, pursuant to a search warrant, which was executed on September 28, 2010, Detective Whalen searched Appellant's residence, which was approximately one block from the victims' row house; however, he did not find any of the stolen property. N.T. 7/7/11 at 48–49, 64.

On cross-examination, Detective Whalen clarified he lifted the fingerprints from the frame of the television, in the area where a person would touch the television in order to carry it. N.T. 7/7/11 at 56. Detective Whalen confirmed he looked in the area where Mr. Walters indicated he had discovered the television and, in his opinion, the television would have fit completely under the fence in the fashion described by Mr. Walters. N.T. 7/7/11 at 59–60.

At this point, the parties stipulated the police laboratory's report indicated one of the fingerprints, which Detective Whalen submitted, belonged to Appellant. N.T. 7/7/11 at 65.

Appellant's father testified he, his wife, and Appellant lived in the same house and, on September 6, 2010, Appellant was at home; however, at approximately 11:30 a.m., Appellant left to go to the store to buy coffee for them. N.T. 7/7/11 at 73–74, 92. Within five minutes, Appellant returned to the house and, following a conversation, Appellant's father, concluding Appellant intended to buy a television from someone in the neighborhood, gave Appellant $20.00. N.T. 7/7/11 at 81–83. Appellant's father told Appellant "if he was going to buy a TV, make sure everything is right with the TV before you make a purchase....If it's not right, bring me my money back." N.T. 7/7/11 at 82–83. Appellant left again, returned five minutes later without a television, and gave the $20.00 back to his father. N.T. 7/7/11 at 83. Appellant's father testified that, aside from the five minutes it took for Appellant to go to the store, and the subsequent five minutes it took for Appellant to inspect the television, Appellant did not leave the house on September 6, 2010. N.T. 7/7/11 at 83–84. Appellant's father indicated he was home when the police executed the search warrant. N.T. 7/7/11 at 92.

At the conclusion of all testimony, the trial court convicted Appellant of the offenses indicated *supra*, and on August 29, 2011, the trial court sentenced Appellant to an aggregate of eighteen months to thirty-six months in prison, to be followed by five years of probation. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

■ Appellant first contends the trial court erred in excluding his out-of-court statement, which he made to his father, indicating that, on the day of the burglary, he told his father "that he was going to go and examine a television that was being sold on the street by someone."[2] Appel-

2. During the direct-examination of Appellant's father, Appellant's attorney attempted to elicit the statement, which Appellant allegedly made to his father on the day of the burglary. N.T. 7/7/11 at 71–76. Concluding the parties should litigate the issue as a mo-

lant's Brief at 8. Appellant contends his father should have been permitted to testify Appellant made this statement to him under Pa.R.E. 803(3)'s state of mind exception to the hearsay rule.[3]

Assuming, *arguendo*, the trial court erred in ruling Appellant's out-of-court statement was inadmissible, we find such error to be harmless.[4] As the trial court notes, although Appellant's father was not permitted to testify Appellant told him "that he was going to go and examine a television that was being sold on the street by someone," evidence of Appellant's alleged intent to "go and examine a television," and the fact he ended up not purchasing the television, on the day of the burglary, was admitted into evidence. Specifically, Appellant's father testified on direct-examination, in relevant part, as follows:

> THE COURT: So the question that's posed to you right now is what did you say to him. What were the exact words that you said to him after he returned from the store?

[Appellant's Father]: Well, my exact words, I said, thank you for my coffee. Put the change on the table. And I said—I told him to stay out of trouble, you know, because it's hot around the neighborhood. [There's] a lot of police around the neighborhood.

\* \* \*

[Defense Counsel]: Sir, do you remember that when he came back, he said something to you; is that correct?

[Appellant's Father]: Yes, he did.

[Defense Counsel]: Okay. And in response to that thing that he said to you, did you say something to him? Do you remember?

[Appellant's Father]: Yes, I do.

[Defense Counsel]: Okay. And what did you say back to him?

[Appellant's Father]: He—I said to [Appellant], I said make sure everything is right.

[Defense Counsel]: Make sure everything is right with what?

[Appellant's Father]: I told him if he was going to buy a TV, make sure ev-

tion *in limine*, the Honorable Daniel Anders, who was sitting as the finder of fact, took a one hour break and referred the motion to a different judge, the Honorable John O'Grady, who held a short hearing on the issue of whether Appellant's out-of-court statement was admissible as it related to his intent to examine and purchase a television from someone in the neighborhood. Judge O'Grady ruled the statement was inadmissible, and the parties returned to the bench trial before Judge Anders for the continuation of Appellant's father's direct-examination.

3. "Hearsay ... is a statement made by someone other than the declarant while testifying at trial and is offered into evidence to prove the truth of the matter asserted[.]" *Commonwealth v. Ali*, 608 Pa. 71, 126, 10 A.3d 282, 315 (2010) (quotation omitted). Hearsay is admissible if it fits within one of several recognized hearsay exceptions, including the ex-

ception set forth in Pa.R.E. 803(3), which provides as follows:

> **Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

Pa.R.E. 803(3) (bold in original).

4. "[H]armless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt." *Commonwealth v. Noel*, 53 A.3d 848, 857 n. 4 (Pa.Super.2012) (quotation omitted).

erything is right with the TV before you make a purchase.

[Defense Counsel]: And did—thank you. And did you give him anything?

[Appellant's Father]: Yes, I did.

[Defense Counsel]: What did you give him?

[Appellant's Father]: I gave him $20.

[Defense Counsel]: And what was your purpose in giving him $20?

[ADA]: Objection.

THE COURT: I'll allow it.

[Appellant's Father]: My purpose—he said—he said—

[Defense Counsel]: No, sir. Again—I'm sorry to interrupt.

[Appellant's Father]: I understand. I told him make sure everything was right with the TV that he was trying to purchase for $20. And I told him go make sure that it's right. If it's not right, bring me my money back. He was only gone for five minutes.

[Defense Counsel]: Well, sir, let me stop you right there. So after you said this to him, he left the house again; is that correct?

[Appellant's Father]: Correct.

[Defense Counsel]: How long was he gone for?

[Appellant's Father]: Five minutes.

[Defense Counsel]: And what happened when he came back? And again, don't tell me what he said. Just tell me what happened.

[Appellant's Father]: And he gave me my money back.

[Defense Counsel]: Okay.

\*  \*  \*

[Defense Counsel]: Other than those five minutes the first time and five minutes the second time, did he leave the house at all that day?

[Appellant's Father]: No.

N.T. 7/7/11 at 80–84.

Based on this evidence, the trial court indicated in its Rule 1925(a) opinion that any error in the court precluding Appellant's father from testifying Appellant said "he was going to go and examine a television that was being sold on the street by someone" constituted harmless error. Specifically, the trial court stated as follows in its opinion:

> Even if it were error to exclude [Appellant's] statement at trial, it was harmless error in light of [Appellant's] father's testimony at trial. At trial, the trial court permitted [Appellant's] father to testify, *inter alia,* that "I told him to make sure everything is right with the TV that he was trying to purchase for $20[,] and I told him to go make sure it's right[, and] if it's not right, bring my money back, and that [Appellant] returned the $20 to his father five minutes later. (N.T., Trial, 07/07/2011 at 82–83). As such, evidence of Appellant's alleged intent to purchase a television was admitted at trial, and it was harmless error to have excluded [Appellant's] hearsay statements.

Trial Court Opinion filed 4/25/12 at 3.

We find no abuse of discretion in this regard and agree with the trial court that any error in the exclusion of Appellant's out-of-court statement were merely *de minimis. See Commonwealth v. Szakal,* 50 A.3d 210, 228 n. 12 (Pa.Super.2012) ("Harmless error exists where … the error did not prejudice the defendant or the prejudice was de minimis[.]") (quotation omitted). Specifically, the substance of Appellant's out-of-court statement, i.e., "he was going to go and examine a television that was being sold on the street by someone," was sufficiently suggested by Appellant's father's testimony. Since the trial court heard, and rejected, this evidence

suggesting a legitimate reason for Appellant's fingerprint being on the television, we find any error in excluding Appellant's out-of-court statement on the issue to be harmless. *See Szakal, supra.*

■ Appellant's next contention is the evidence was insufficient to sustain his convictions. Specifically, Appellant contends that, while there was sufficient evidence to prove a burglary took place, there was insufficient evidence to prove Appellant's identity as the perpetrator of the burglary. In this vein, Appellant contends "under [the] circumstances, where a single fingerprint is present on a moveable object later found outside the home, the evidence simply does not prove [Appellant's] guilt beyond a reasonable doubt." Appellant's Brief at 7.

> In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. We may not weight the evidence and substitute our judgment for the fact-finder. To sustain a conviction, however, the facts and circumstances which the Commonwealth must prove must be such that every essential element of the crime is established beyond a reasonable doubt.
>
> *Commonwealth v. Cain,* 906 A.2d 1242, 1244 (Pa.Super.2006), *appeal denied,* 591 Pa. 670, 916 A.2d 1101 (2007) (citations omitted). Lastly, the finder of fact may believe all, some or none of a witness's testimony.

*Commonwealth v. Bullock,* 948 A.2d 818, 823 (Pa.Super.2008) (citations omitted).

Recently, in *Commonwealth v. Donohue,* 62 A.3d 1033 (Pa.Super.2013), this Court examined the sufficiency of the evidence in a case where, as here, the sole evidence supporting the appellant's identity as the perpetrator of the burglary and related crimes consisted of fingerprints discovered at the scene of the crime. Specifically, in *Donohue,* the sole evidence linking the appellant to a burglary of a residential property was two fingerprints, which the police lifted from a bottle of Pepsi. *See id.* When the property owner left and locked the door at around 7:00 p.m. on June 20, 2010, the bottle of Pepsi was left unopened in a kitchen cabinet; however, when the property owner returned to the residence after the burglary, at around 10:00 a.m. on June 21, 2010, the bottle of Pepsi was in the basement, opened, and with most of its contents consumed. *See id.* Two fingerprints lifted from the Pepsi bottle belonged to the appellant. *See id.* Based on these facts, we found the evidence to be sufficient to sustain the conclusion that the appellant was the person who had burglarized the residence. *See id.* In so doing, we reviewed in detail the existing cases in this area of the law and specifically held, in relevant part, the following:

> There are various cases that discuss the sufficiency of the evidence to support a conviction where, as here, the sole evidence consists of fingerprints discovered at the scene of the crime. In the seminal decision of *Commonwealth v. Cichy,* 227 Pa.Super. 480, 323 A.2d 817, 818 (1974), we observed that the accuracy of fingerprint evidence for purposes of identification is established and that the probative value of that evidence depends entirely on the circumstances of each case. Unless those circumstances are such that the fingerprint could only have been impressed at the time and place the crime was committed, such evidence is insufficient to sustain a con-

viction. On the other hand, where circumstances indicate impression at [the time of the crime], and the defendant's innocent presence is excluded, such evidence has been held sufficient to convict.

Under these precepts, a conviction will be upheld where fresh fingerprints are found at the place of illegal entry to private burglarized premises where a defendant's presence is unexplained. Similarly, if the prints are discovered in a place accessible only by force or on objects that the defendant could not have contacted under legitimate circumstances, a conviction will be upheld. However, the mere discovery of prints in a public place with which a number of people may have had innocent contact is insufficient by itself to convict. Additionally, if the prints are located on a readily movable object in common usage and the possibility of innocent contact with that object is great, the conviction will not be sustained.

A comparison of the fingerprint cases established the uniform application of these principles. In *Cichy*, the defendant was convicted solely based on the fact that his fingerprints were discovered on a cigarette pack located next to a vending machine in a public venue that was burglarized. We ruled that the conviction was infirm, given that the defendant admittedly had visited the scene of the burglary during normal business hours before the date of the burglary, no prints were discovered on the cigarette machine, and there was no indication that the cigarette package with the defendant's prints was taken from the machine. Thus, in *Cichy*, there was an innocent explanation for the presence of the prints on the package, which could have been left behind when the defendant was on the premises during business hours. We concluded that the discovery of the prints on a

moveable object in a public venue is insufficient to establish a person's presence at the crime scene during the commission of the crime.

In the case of *In re M.J.H.*, 988 A.2d 694 (Pa.Super.2010), we applied *Cichy* and reversed an adjudication of delinquency that was premised upon the juvenile's commission of acts constituting burglary and theft. In that case, a clothing store was ransacked and burglarized, and the juvenile's fingerprints were discovered on a clothing rack readily accessible to the public, but not at or near the point of illegal entry into the store. Additionally, evidence was presented that, on two or three occasions before the burglary, the juvenile was present in the store during normal operating hours.

We observed that the juvenile's fingerprints were discovered at a location where his presence was explained through innocent behavior and from an object with which he could have had legitimate contact. We concluded that the possibility that the juvenile had made innocent contact with the clothing rack was too great to permit a determination that he was the person who ransacked and burglarized the store.

Conversely, in numerous cases, we have upheld the sufficiency of the evidence supporting a conviction premised solely on the fact that the defendant's fingerprints were at the scene of the crime. Pursuant to these decisions, imprints constitute sufficient evidence so long as the facts of the crime eliminate an innocent explanation for the presence of the defendant's fingerprints on an object. In *Commonwealth v. Price*, 278 Pa.Super. 255, 420 A.2d 527 (1980), ... we upheld a conviction of burglary. The defendant was convicted of burglarizing a private residence, and the lone evi-

dence linking him to that crime was the fact that, after the burglary, his fingerprints were discovered on a television located in the burglarized premises near the point of entry . . . [T]he homeowners left their house at 6:00 p.m., locked it, and closed the window, and when they returned six hours later, items were stolen. There were no fingerprints at the point of entry, an opened window, but the defendant's fingerprints were found on a nearby television. The homeowners testified that they did not know the defendant and that he did not have permission to enter their abode. There being no plausible innocent explanation for the defendant's imprints, we ruled that the evidence was sufficient to sustain the conviction.

The facts examined in *Commonwealth v. Wilson*, 258 Pa.Super. 231, 392 A.2d 769 (1978) . . . [revealed] the defendant and a cohort burglarized a private house and terrorized its occupants, who did not know [the] defendant. The defendant's identification as a perpetrator was premised on the fact that his fingerprints were found in the home. The defendant challenged the sufficiency of the evidence supporting . . . [his identity as the perpetrator].

We disagreed with his sufficiency challenge because there was simply no logical explanation for finding [the] [defendant's] fingerprints on the lamp and closet in the . . . residence, except that he inadvertently placed them there while burglarizing the . . . home and terrorizing its occupants.

Herein, there was no innocent explanation for the presence of [the] [appellant's fingerprints on the soda bottle located at the crime scene. The burglarized premises were a private residence, and [the] [appellant, unknown to the owner, had no right to be located there. The proof also established that the impression of the soda bottle, even though moveable, was made during the burglary. The bottle was in a kitchen cabinet and unopened at 6:00 p.m. on June 20, 2010, when the owner locked the door and closed the windows to her property. The item was found in the basement, opened, and partially consumed sixteen hours later. The burglary occurred during those hours. When discovered on June 21, 2010, the bottle had two imprints, a thumb and forefinger, which were identified as those of [the] [appellant. Under the precepts applicable to fingerprint evidence, [the] [appellant's convictions therefore are not infirm.

*Donohue*, 62 A.3d at 1035–38 (quotations, quotation marks, citations, and parentheticals omitted).

Similar to our conclusion in *Donohue*, we find the evidence in the case *sub judice* sufficient to sustain Appellant's convictions. Herein, the trial court found there was no innocent explanation for the presence of Appellant's fingerprint on the television and, in so finding, expressly rejected as incredible Appellant's attempt to explain why his fingerprint was on the television; namely, that he touched the television in the process of attempting to buy it from someone in the neighborhood. *See* Trial Court's Opinion filed 4/25/12 at 4. We are bound by the trial court's credibility determination in this regard. *See Bullock, supra.* Additionally, as in *Donohue*, the burglarized premises was a private residence, and Appellant was unknown to the occupants. Furthermore, Appellant had no right to the inside of the residence, where he could have legitimately touched the television, or to the fenced in backyard, which is the area where Mr. Walters discovered the television shortly after the burglary. The proof established the impression made on the television, even

though movable, was made during the burglary. The television was in Mr. Somers' bedroom when the last occupant, Mr. Walters, left the row house and locked the doors at 11:00 a.m. on September 6, 2010. When Mr. Walters returned to the row house a mere two hours and forty minutes later, he noticed the back door's window was broken and the television was missing from Mr. Somers' bedroom. Upon inspecting the fenced in backyard, Mr. Walters noticed one of his patio chairs had been placed up against the fence in his absence from the row house. He also discovered that, in an apparent attempt to hide the television, the burglar had tucked the television behind the fence and, at least partially, covered it with brush. As the trial court noted, "[it] is credible and supported by evidence of record that [Appellant] burglarized [the row home] and took the most valuable items that he could carry over the two fences; he left behind one item that he was not able to carry over the two fences, i.e., the television." Trial Court Opinion filed 4/25/12 at 4. Mr. Walters testified he carefully removed the television from behind the fence and no one else touched it until the detective dusted it for fingerprints, one of which was identified as belonging to Appellant. Under the precepts applicable to fingerprint evidence, as discussed *supra,* Appellant's convictions are not infirm.

For all of the foregoing reasons, we affirm Appellant's judgment of sentence.

Affirmed.