VICE CHANCELLOR

**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: April 12, 2016
Date Decided: May 11, 2016

Jay W. Eisenhofer, Esquire
James J. Sabella, Esquire
David M. Haendler, Esquire
Michael T. Manuel, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801

Srinivas M. Raju, Esquire
Brock E. Czeschin, Esquire
Sarah A. Galetta, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

   Re:   *Employees Retirement System of the City of St. Louis v. TC
         Pipelines GP, Inc., et al*, CA No. 11603-VCG

Dear Counsel:

Delaware alternative entity law is explicitly contractual;[1] it allows parties to

eschew a corporate-style suite of fiduciary duties and rights, and instead to provide

for modified versions of such duties and rights—or none at all—by contract. This

custom approach can be value enhancing, but only if the parties are held to their

bargain. Where equity holders in such entities have provided for such a custom

menu of rights and duties by unambiguous contract language, that language must

control judicial review of entity transactions, subject only to the cautious application

---

[1] *See, e.g.*, 6 *Del. C.* § 17-1101(c) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.").

of the implied covenant of good faith and fair dealing. Such is the case in the instant matter, which involves a master limited partnership ("MLP") created with interested transactions involving the general partner as part of its business model.

Before me is the Defendants' Motion to Dismiss. The Plaintiff is a limited unitholder in an MLP, Nominal Defendant TC Pipelines, LP ("TCP" or the "Partnership") and filed this action to challenge a conflicted transaction in which the parent of TCP's general partner, Defendant TC Pipelines GP, Inc. ("TCP-GP" or the "General Partner"), sold a pipeline asset to TCP (the "Dropdown"). The Plaintiff alleges that the General Partner breached the partnership agreement, arguing that the Dropdown was unfair to the Partnership and that the General Partner orchestrated the transaction in bad faith. The Defendants contend that the Plaintiff's allegations must be dismissed, because the contractual obligation of the General Partner was to ensure that conflicted transactions are "fair and reasonable" to TCP. The Defendants point out that the Dropdown was approved by a special committee (the "Conflicts Committee"), which approval, in accordance with the partnership agreement, creates a conclusive presumption that the transaction is fair and reasonable to the Partnership. I find that the Conflicts Committee's approval, in these circumstances, precludes judicial scrutiny of the substance of the transaction and grant the Defendants' Motion. A brief description of the facts and my analysis follow.

2

*A. Background of the Action[2]*

Plaintiff Employees Retirement System of the City of St. Louis owns common units representing a limited partner interest in Nominal Defendant TCP.[3] TCP is a publicly traded Delaware MLP formed to acquire, own, and participate in the management of energy infrastructure businesses in North America.[4] The Partnership is managed and operated by its general partner, TCP-GP, which is a subsidiary of Defendant TransCanada Corporation.[5] Defendant TransCanada American Investments Ltd. is a wholly owned subsidiary of TransCanada Corporation and is the entity that was used to perfect the transaction at issue here.[6] For purposes of this Letter Opinion and consistent with the Plaintiff's Complaint,[7] I refer to the TransCanada Defendants collectively as "TransCanada."

Prior to February 24, 2015, TCP owned 70% of Gas Transmission Northwest, LLC ("GTN").[8] GTN owns the GTN pipeline, which is a 1,353-mile pipeline stretching between British Columbia and Malin, Oregon near the California boarder.[9] TCP acquired its 70% interest from TransCanada through two previous

---

[2] For purposes of the Defendant's Motion to Dismiss, the facts are drawn from the Plaintiff's Verified Class Action and Derivative Complaint ("Compl." or "Complaint") and are assumed true.
[3] Compl. ¶ 14.
[4] *Id.* at ¶ 15.
[5] *Id.* at ¶¶ 15–16.
[6] *Id.* at ¶ 18.
[7] *Id.* at 1–2.
[8] *Id.* at ¶ 3.
[9] *Id.*

transactions in which TCP paid cash and assumed GTN debt in return for its interest.[10]

On February 24, 2015, TCP entered into a definitive agreement to acquire the remaining 30% ownership interest in GTN from TransCanada (the "Dropdown").[11] In exchange for the remaining interest in GTN, TCP agreed to pay TransCanada $446 million, comprised of $253 million in cash, assumption of debt totaling $98 million, and the issuance of newly created Class B units valued at $95 million.[12] The newly created Class B units entitle the holder to annual distributions from the cash flow *attributable to the Dropdown* as follows: the cash flow over $15 million in 2015; the cash flow over $20 million in 2016 through 2019; 43.75% of the cash flow over $20 million in 2020; and 25% of the cash flow over $20 million in later years.[13] The Dropdown was approved by TCP-GP's Conflicts Committee and required an amendment to the Second Amended Partnership Agreement (the "LPA")[14] to issue the newly created Class B shares.[15]

---

[10] *Id.* at ¶¶ 3–4.
[11] *Id.* at ¶ 3.
[12] *Id.* at ¶ 5.
[13] *Id.* at ¶ 25.
[14] The LPA was not attached to the Complaint, but was instead submitted via letter by the Defendants. *See Emps. Ret. Sys. of St. Louis v. TC Pipelines GP, Inc.*, C.A. No. 11603-VCG (Del. Ch. Apr. 11, 2016) (LETTER), Ex. ("LPA § __"). I consider the LPA a part of the universe of facts here because it is referenced in the Complaint and serves the basis for the bulk of the Plaintiff's claims. *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 2011 WL 4599654, at *8 (Del. Ch. Sept. 30, 2011).
[15] Compl. ¶¶ 34, 38.

The Plaintiff filed its Verified Complaint on October 13, 2015, asserting six counts that challenge the Dropdown. Under the LPA, conflicted transactions by the General Partner must be "fair and reasonable" to the Partnership. In Counts I and II, the Plaintiff alleges that TCP-GP breached the LPA by causing the Dropdown, and thereby causing the issuance of Class B units, on terms that are not "fair and reasonable" to TCP.[16] By causing the transaction, the Plaintiff argues, TCP-GP breached the LPA by failing to act in good faith.[17] In Counts III and IV, the Plaintiff alleges that TCP-GP breached the implied covenant of good faith and fair dealing by causing the Dropdown, and thereby causing the issuance of Class B units, on terms that are not "fair and reasonable" to TCP.[18] In Counts V and VI, the Plaintiff alleges that TransCanada aided and abetted TCP-GP's breach of the LPA and that TransCanada tortiously interfered with the LPA.[19] In relief, the Plaintiff seeks, among other things, an order directed at TCP-GP, TransCanada, or any related entity to disgorge any distribution beyond the value assigned to the Class B units ($95 million) as of April 1, 2015; an order that TransCanada return some or all of the Class B units to TCP; an order rescinding the April 1, 2015 amendments to the LPA; an order enjoining TCP-GP from entering into future transactions whereby Class B

---

[16] *Id.* at ¶¶ 56–64.
[17] *Id.*
[18] *Id.* at ¶¶ 65–72.
[19] *Id.* at ¶¶ 73–82.

5

units are issued to TransCanada or any of its subsidiaries; and damages.

*B. Analysis of the Motion*

The Defendants filed a Motion to Dismiss on November 10, 2015, arguing that the Plaintiff's Complaint should be dismissed for failure to state a claim.[20] The Court will grant a motion to dismiss under Court of Chancery Rule 12(b)(6) where the complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief.[21] The motion will be denied "unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[22]

As discussed at oral argument, the Plaintiff's overall claim in Counts I through IV is that the Dropdown was a breach of the LPA because it was not fair and reasonable to TCP. The Plaintiff asserts that the Dropdown was accepted on terms requiring consideration substantially different than the previous GTN dropdowns, and that such consideration was not fair and reasonable to TCP because it undervalues the Class B units given up by TCP. The Defendants dispute that allegation, arguing that the Dropdown is conclusively fair and reasonable, and thus in compliance with the LPA, because it was approved pursuant to a "safe harbor" in which the Conflicts Committee provided "Special Approval." The Plaintiff argues,

---

[20] *See* Ct. Ch. R. 12(b)(6).

[21] *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *9 (Del. Ch. Jan. 29, 2016) (citing *Lucas v. Hanson*, 2014 WL 7235462, at *2 (Del. Ch. Dec. 19, 2014)).

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings. LLC*, 27 A.3d 531, 537 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

6

however, that the safe harbor was not satisfied. First, according to the Plaintiff, the LPA explicitly requires the Conflicts Committee to act in good faith when providing Special Approval, which warrants judicial review of the Conflict Committee's approval of the Dropdown. Second, and alternatively, to the extent an explicit good-faith contractual duty does not arise in the LPA, the Plaintiff argues that such a duty must be imputed by the implied covenant of good faith and fair dealing. In either case, the Plaintiff contends that the Conflicts Committee failed to act in good faith pursuant to its Special Approval, thereby precluding the General Partner's reliance on the safe harbor. Accordingly, my analysis is limited to whether the safe harbor applies to the Dropdown. I assume, for purposes of this Letter Opinion, that the Dropdown is a conflicted transaction, and that it is materially less favorable to TCP compared to the prior GTN dropdowns.

As to the explicit provisions of the LPA, I conclude that the safe harbor provision, as well as the other relevant provisions, do not expressly require the Conflicts Committee to act in good faith pursuant to its Special Approval, such that judicial review of the Conflict Committee's actions is appropriate. In interpreting contractual language, the Court will "give words their plain meaning unless it appears that the parties intended a special meaning."[23] Furthermore, the Court

---

[23] *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (citing *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)).

7

construes contracts "as a whole and give[s] effect to every provision if it is reasonably possible."[24]

The language of the LPA is clear. As an initial matter, the LPA expressly contemplates conflicted asset sales between affiliates of the General Partner and TCP. To allow such transactions while protecting the interests of limited partners, Section 7.6(e) provides that "[n]either the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership . . . , except pursuant to transactions that are fair and reasonable to the Partnership."[25] Thus, the Dropdown is permitted only to the extent it is contractually "fair and reasonable" to TCP.

Section 7.9(a) of the LPA establishes a safe harbor for conflicts of interests generally.[26] The first part of Section 7.9(a) states the following:

> Unless otherwise expressly provided in this Agreement . . . , whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership . . . ,

---

[24] *Id.* (citing *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[25] LPA § 7.6(e).

[26] In the context of a contested merger, the Delaware Supreme Court found that the language in Section 7.9(a) establishes a *permissive* safe harbor:

> [T]he Vice Chancellor correctly held that Section 7.9(a) is "a permissive safe harbor." Our construction of the LPA indicates that Section 14.2's "discretion" standard applies to mergers generally, and that K–Sea GP may (if it so chooses) take advantage of Section 7.9(a)'s safe harbor provisions to resolve any conflict of interest relating to a merger. A resolution of a conflict of interest that is actually, or is deemed to be, fair and reasonable is deemed approved and is not a breach of the LPA. If K–Sea GP does not meet that standard, however, that does not automatically put K–Sea GP in breach of the LPA.

*K-Sea Transp. Partners L.P.*, 67 A.3d at 364–65 (footnotes omitted).

on the other, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest *shall be permitted and deemed approved by all Partners*, and *shall not constitute a breach of this Agreement . . . , or of any duty stated or implied by law or equity*, if the resolution or course of action is, *or by operation of this Agreement is deemed to be*, fair and reasonable to the Partnership.[27]

That Section continues by providing four ways in which the safe harbor can be satisfied, pursuant to which the transaction is contractually "deemed to be" fair and reasonable. If any one of the four options is met, the contractual language explicitly provides that the conflict of interest is "conclusively" deemed "fair and reasonable" to TCP. One such option—pertinent here—is met by obtaining Special Approval from the Conflicts Committee. Section 7.9(a) states, in part, the following:

> The General Partners shall be authorized but not required in connection with its resolution of such conflict of interest to seek Special Approval of such resolution. Any conflict of interest and any resolution of such conflict of interest shall be *conclusively deemed fair and reasonable* to the Partnership if such conflict of interest or resolution is (i) approved by Special Approval (as long as the material facts known to the General Partner or any of its Affiliates regarding any proposed transaction were disclosed to the Conflicts Committee at the time it gave its approval), . . . .[28]

The LPA provides the definition of what constitutes the "Conflicts Committee." According to the LPA, the Conflicts Committee is "a committee of the Board of Directors of the General Partner composed entirely of two or more directors *who are neither security holders, officers nor employees of the General Partner nor officers*

---

[27] LPA § 7.9(a) (emphasis added).
[28] *Id.* (emphasis added).

9

*or employees of any Affiliate of the General Partner.*"[29]  The Complaint does not contend that the Conflicts Committee, as actually constituted, fails this procedural requirement.  The LPA also delineates what "Special Approval" means.  Special Approval is defined as "approval by a majority of the members of the Conflicts Committee."[30]  In order to constitute a "Special Approval" adequate to constitute a safe harbor for a conflicted transaction, moreover, the Conflicts Committee must be informed of material facts: Special Approval satisfies the safe harbor "as long as the material facts known to the General Partner or any of its Affiliates regarding any proposed transaction were disclosed to the Conflicts Committee at the time it gave its approval."[31]  Section 7.9(a) concludes, in part, by providing the Special Committee broad authority pursuant to its Special Approval.  That Section states, in part, the following:

> The General Partner (*including the Conflicts Committee in connection with Special Approval*) shall be authorized in connection with *its determination of what is "fair and reasonable"* to the Partnership and in connection with its resolution of any conflicts of interest to consider . . . (D) such additional factors as the General Partner (including the Conflicts Committee) determines in its sole discretion to be relevant, reasonable or appropriate under the circumstances.[32]

When read as a whole, Section 7.9(a) provides that when a conflicted

---

[29] *Id.* § 1.1 (emphasis added).
[30] *Id.*
[31] *Id.* § 7.9(a) (quoting the proviso in parenthesis).
[32] *Id.* (emphasis added).

10

transaction arises, the transaction will not constitute a breach of the LPA, or any duty stated or implied by law or equity, if the transaction is deemed "fair and reasonable" to TCP by operation of the LPA. Moreover, in accordance with the LPA, a conflicted transaction will be *"conclusively"* deemed to be "fair and reasonable" to TCP if Special Approval is given by a fully informed Conflicts Committee. Again, Special Approval is "approval by a majority of the members of the Conflicts Committee,"[33] which members must be independent of the GP or its affiliates. This safe harbor provision thus provides unitholders with specific, but contractually limited, procedural protections: review and approval by an independent and informed committee.

The relevant portions of the Special Approval provision, importantly, are silent as to good faith. While the Plaintiff points to other parts of the LPA which, it argues, impute a good-faith requirement generally, the text of Section 7.9(a) leaves no room for the reader to look elsewhere in the contract—other than to the definition of the terms used therein—to determine the obligations of a duly formed Conflicts Committee acting in consideration of the Special Approval of a conflicted transaction. According to the contractual language, the Special Approval of a duly constituted and fully informed Conflicts Committee is *conclusive* evidence that such transaction is fair and reasonable, and such approval is, therefore, *preclusive* of

---

[33] *Id.* § 1.1.

11

further judicial review. The Plaintiff does not allege that the Conflicts Committee was not duly constituted—that is, directors who are neither security holders nor employees or officers of the General Partner or its affiliates. Nor does the Plaintiff allege that the Conflicts Committee was not fully informed. Thus, the approval here is conclusive that the Dropdown is "fair and reasonable" to TCP. According to the explicit language of the LPA, when a conflicted transaction is deemed "fair and reasonable" by the terms of the agreement, such conflicted transaction is incapable of breaching the LPA.

My interpretation of the plain meaning of Section 7.9(a) is supported by the Supreme Court's recent holding in *The Haynes Family Trust v. Kinder Morgan G.P., Inc.*[34] In affirming the lower court's review of a partnership agreement with nearly identical language to the LPA here, the Supreme Court held:

> [T]here was no room for a substantive judicial review of the fairness of the transaction, because the general partner had complied with its contractual duties in the approval process of the merger and that compliance conclusively established the fairness of the transaction, *precluding* the judicial scrutiny that the unitholders now seek. . . . This case therefore stands as another reminder that with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights.[35]

---

[34] 2016 WL 912184 (Del. Mar. 10, 2016) (ORDER).

[35] *Id.* at *1–2 (emphasis added). I note that in the opinion underlying *Kinder Morgan*, this Court indicated that the holding in *Norton v. K-Sea Transportation Partners L.P.* may require substantive judicial review of a transaction approved by the majority of a duly constituted conflicts committee to determine whether Special Approval was validly obtained. *See In re Kinder Morgan, Inc. Corporate Reorganization Litig.*, 2015 WL 4975270, at *7 (Del. Ch. Aug. 20, 2015) (citing *K-Sea Trans. Partners L.P.*, 67 A.3d 354); *see also Brinckerhoff v. Enbridge Energy Co., Inc.*, 2016 WL 1757283, at *17 n.123 (Del. Ch. Apr. 29, 2016). In light of the Delaware Supreme Court's clear

Consistent with the Supreme Court's holding in *Kinder Morgan*, I find that the plain language of the LPA leaves no room for judicial scrutiny of a conflicted transaction, in light of the contractual language at issue here, if Special Approval is given by a duly constituted and informed Conflicts Committee.

I note, again, that the Conflicts Committee has approved the Dropdown, and that Plaintiff has not raised any allegations that the Conflicts Committee was not duly constituted, or that it lacked material information as required by the safe harbor.[36] Therefore, the Dropdown is deemed fair and reasonable to TCP and does not constitute a breach of the express terms of the LPA. Counts I and II are accordingly dismissed with prejudice.[37]

In Counts III and IV, the Plaintiff asserts that, to the extent the express terms

---

statement in affirming this Court's decision in *Kinder Morgan*, however, there is no room for judicial scrutiny of the substance of the transaction where compliance with the partnership agreement has conclusively established the fairness of the transaction. *See Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *1.

[36] *See Brickell Partners v. Wise*, 794 A.2d 1, 4 (Del. Ch. 2001) (In assessing a nearly identical safe-harbor provision, the then-Vice Chancellor Strine found that "the plain and unambiguous language of § 6.9 of the Partnership Agreement displaces traditional fiduciary duty principles. In place of such principles, the Agreement provides limited partners solely with the protection of Conflicts and Audit Committee Review when DeepTech decides to seek 'Special Approval' of a conflict transaction, as it did here. Such 'Special Approval' is 'conclusive [ ]' evidence of the 'fair[ness] and reasonable[ness]' of a conflict transaction, and bars any challenge to the transaction based on the Agreement, other contracts, or default principles of law or equity. As a result, the plain language of the Agreement appears to compel a dismissal of the complaint, assuming the plaintiff has not pled facts suggesting that the defendants did not comply with § 6.9 itself.") (internal citations omitted).

[37] I note that the Defendants argue that the Conflicts Committee, having relied on professional advisors, is "conclusively presumed" to have acted in good faith. Opening Br. 21–22. Based on my findings above, however, I need not determine the impact, if any, of the Conflicts Committee's reliance on a professional advisor.

13

of the LPA do not impose a duty of good faith on the Conflict Committee, such a contractual duty must be inferred consistent with the implied covenant of good faith and fair dealing. According to the Plaintiff, "the implied covenant of good faith and fair dealing requires that when the Conflicts Committee votes on Special Approval, it must determine, in good faith, whether the transaction at issue is in the interest of the Partnership."[38]

The Delaware Revised Uniform Limited Partnership Act provides that while a partner's duties may be "expanded or restricted or eliminated" by a partnership agreement, a "partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing."[39] The Courts apply the implied covenant of good faith and fair dealing cautiously to infer contractual terms or gaps to address situations that the contracting parties did not anticipate.[40] Accordingly, "[o]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement."[41] To determine whether the implied covenant applies, the Court "must assess the parties' reasonable expectations *at the time of contracting* and not rewrite the contract to appease a party who later wishes to avoid provisions of a contract he now believes to have been a bad deal."[42]

---

[38] Ans. Br. 15.

[39] 6 *Del. C.* § 17-1101(d).

[40] *See Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

[41] *Id.* at 1125–26 (quoting *Dunlap*, 878 A.2d at 441).

[42] *Id.* at 1126 (emphasis added) (internal citation omitted).

The Plaintiff argues that a "gap" exists in the LPA because it fails to provide a standard to "guide" the Conflicts Committee in its Special Approval of a conflicted transaction. Therefore, according to the Plaintiff, the Court should supply a standard that requires the Conflicts Committee to "determine, in good faith, whether the transaction at issue is in the best interest of the Partnership." The LPA, however, explicitly supplies the standard the Conflicts Committee must follow; the LPA states that the Conflicts Committee must determine that the transaction is "fair and reasonable" to TCP.[43] Seemingly conceding that determination, the Plaintiff argues that the Court should supply a term because the breadth of the factors that the Conflicts Committee may consider in its Special Approval renders its approval meaningless.[44] As I read Section 7.9(a), the Conflicts Committee's task remains the same no matter how broad and diverse its available inputs; it must determine that the transaction is "fair and reasonable" to TCP. This action, I note, is taken by an independent and informed committee. The safe harbor's guiding standard, therefore, is not deficient so that the implied covenant requires the Court to supply a term.[45]

---

[43] *See* LPA § 7.9(a) ("The General Partner (including the Conflicts Committee in connection with Special Approval) shall be authorized in connection with its determination of what is *'fair and reasonable' to the Partnership* and in connection with its resolution of any conflict of interest . . . .") (emphasis added).

[44] *See id.* (providing that the Conflicts Committee may consider various factors, including "(D) such additional factors as the General Partner (including the Conflicts Committee) determines in its sole discretion to be relevant, reasonable or appropriate under the circumstances").

[45] *See Dieckman v. Regency GP LP*, 2016 WL 1223348, at *9 (Del. Ch. Mar. 29, 2016) ("[I]f no gap exists, the implied covenant has no work to do.").

15

The Plaintiff's primary complaint, to my mind, is not that the Conflicts Committee acted in a way that was unanticipated, but that the Conflicts Committee approved a transaction that the Plaintiff believes is unfair to the unitholders from their point of view as of the time of the transaction—that is, *not* at the time of contracting. Those allegations, by themselves, do not implicate the implied covenant of good faith and fair dealing here. "Parties have a right to enter into good and bad contracts, the law enforces both."[46] At the time the LPA was negotiated,[47] the parties anticipated that conflicted transactions would arise, and they bargained for a procedural safeguard, with the decision to enter the transaction referred to an independant and informed committee of the General Partner. In other words, they contractually agreed on a safe harbor that provides that such conflicts could be cleansed by the Special Approval of an informed Conflicts Committee. Based on the pleadings before me, and in light of the intentions of the parties at the time of contracting as expressed by the plain language of the LPA, I cannot conclude that

---

[46] *Nemec*, 991 A.2d at 1126; *see also* 6 *Del. C.* § 17-1101(c) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.").

[47] When applying the implied covenant of good faith and fair dealing, the temporal focus is critical. *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013) (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665, 2013 WL 1914714 (Del. 2013)), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 67 A.3d 808 (Del. 2013). The implied covenant "looks to the past," and seeks to enforce terms that the parties "would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* (quoting *ASB Allegiance Real Estate Fund*, 50 A.3d at 440–42).

the parties did not anticipate the Special Approval of a conflicted transaction such as the one here. Accordingly, Counts III and IV are dismissed with prejudice.[48]

Finally, in Counts V and VI, the Plaintiff asserts that TransCanada aided and abetted TCP-GP's breach of the LPA and that TransCanada tortiously interfered with the LPA. While Delaware law generally does not recognize a claim for aiding and abetting a breach of contract,[49] to the extent the Plaintiff has alleged a breach of duty that can be appropriately measured by contract,[50] the aiding and abetting claim must fail because TCP-GP did not breach the LPA.[51] Likewise, the Plaintiff's claim for tortious interference also fails. Therefore, Counts V and VI are dismissed with prejudice.

To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

---

[48] That is not to say that the applied covenant could never apply in this context. Here, the parties contracted for procedural protections: approval by an informed committee of independent directors as defined by contract. One can imagine, for instance, such a committee, independent under the contract standard, but which has been bribed by the General Partner. It is likely that such a situation was unanticipated by the parties at the time of contracting, and that the unitholders would not have agreed to it; moreover, it would fundamentally deprive the unitholders of the benefit of the bargain, the protection of an independent committee. Nothing similar is alleged here, however.

[49] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *18 (Del. Ch. June 20, 2014) (citing *Gotham Partners L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002)).

[50] *See id.* at *19 ("Because the alternative entity statutes permit the entity's governing agreement to modify, alter, or expand fiduciary duties, there are situations involving alternative entities where a party could owe fiduciary duties, the scope of the fiduciary duty would be established by contract, and a third party could aid and abet a breach of the contractually measured fiduciary duty.").

[51] *See Brinckerhoff*, 2011 WL 4599654, at *11 ("A claim for aiding and abetting a breach of duties, as well as a claim for tortious interference with a contract, requires an underlying breach.") (citations omitted).

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III